IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
JUN 1 0 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| V. | § § | CRIMINAL NO: 1:21-CR-234-LY |
| (1) AMBROSIO NOLASCO-ARIZA | § § | |

## ORDER ON MOTION TO DISMISS

Before the court in the above-referenced cause are Defendant Ambrosio Nolasco-Ariza's Motion to Dismiss Because § 1326 Violates the Fifth Amendment (Doc. #20) and the Government's Opposition to Defendant Ambrosio Nolasco-Ariza's Motion to Dismiss (Doc. #21). Having reviewed the motion, response, applicable law, and record in this case, the court will deny Nolasco-Ariza's motion to dismiss.

### I.   BACKGROUND

On November 16, 2021, the Government charged Nolasco-Ariza by indictment with illegally re-entering the United States. *See* 8 U.S.C. § 1326 ("Section 1326"). Nolasco-Ariza moves to dismiss the indictment, arguing that Section 1326 violates the Fifth Amendment's implicit guarantee of equal protection.

**A.   Legal background**

The Fifth Amendment guarantees that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. All criminal defendants are owed this protection, regardless of immigration status. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987). Implicit in the Fifth Amendment is a prohibition on the federal government "denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). Fifth Amendment equal-protection claims are "analyzed under the same standards as

Fourteenth Amendment equal-protection claims against state actors." *Butts v. Martin*, 877 F.3d 571, 590 (5th Cir. 2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 637 n.2 (1975)).

Equal-protection violations need not explicitly appear in the text of a statute. *Washington v. Davis*, 426 U.S. 229, 241 (1976). Instead, an "invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Id.* at 242. A plaintiff bears the burden of proving the existence of a discriminatory purpose by a preponderance of the evidence. *Hunter v. Underwood*, 471 U.S. 222, 225 (1985). Even if the plaintiff proves an unlawful discriminatory purpose, the law may still be valid if the government can establish by the preponderance of the evidence that the law would have nevertheless been adopted without consideration of the impermissible purpose. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff cannot prove a discriminatory purpose, the court will apply rational-basis review. *See Arlington Heights*, 429 U.S. at 265–66.

**B.     Statutory history**

Congress first broadly criminalized re-entry after removal in 1929. Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 (the "1929 Act"). The 1929 Act made it a felony for any previously deported noncitizen to enter or attempt to enter the United States.

Congress amended and modified the 1929 Act as Section 1326 as part of the Immigration and Nationality Act of 1952, also known as the McCarran-Walter Act (the "1952 Act"), which Congress described as an effort to "make a full and complete investigation of our entire immigration system." Pub. L. No. 82-414, 66 Stat. 163; S. Rep. No. 81-1515, at 803 (1950). The 1952 Act eliminated several perceived defects of the 1929 Act, including a system where defendants received disparate penalties based on the reason for prior deportation. The 1952 Act also added a separate basis of liability for defendants who are "found in" the United States, making

it easier for the Government to enforce the statute by not having to establish where the migrants crossed into the country. *See* 8 U.S.C. § 1326; S. Rep. No. 81-1515, at 654–55.

Since 1952, Section 1326 has been amended five times. In 1988, Congress returned in part to the 1929 scheme by enhancing penalties for defendants with previous convictions for certain crimes. Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471. Two subsequent amendments increased the penalties associated with violations of Section 1326. Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059; Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat. 1796, 2023. The next amendment took place in 1996 and enacted Section 1326(d), which allows collateral attacks on prior deportation in limited circumstances. Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279. The most recent amendment occurred later in 1996 and extended liability to those who have "departed the United States while an order of exclusion, deportation or removal is outstanding." Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-629.

## II.   ANALYSIS

The court must resolve three separate issues in deciding the motion to dismiss. First, the court must decide what level of review applies in analyzing Section 1326. Second, the court must determine what version of the law warrants analysis. Finally, the court must determine whether the law violates the Fifth Amendment under the applicable standard of review.

The record before the court includes *curricula vitae* for Professors Kelly Lytle Hernandez (University of California, Los Angeles), Benjamin Gonzalez O'Brien (San Diego State University), and S. Deborah Kang (University of Virginia); an affidavit of Professor Kang concerning the legislative history of Section 1326; a declaration by Professor Hernandez concerning the history of Section 1326; President Harry Truman's veto of the 1952 Act; a May 14,

3

1951 statement from Peyton Ford, then-Deputy Attorney General, advising Congress of the Department of Justice's views on the proposed 1952 Act; and the transcript of the evidentiary hearing in *U.S. v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1000 (D. Nev. 2021) (holding that Section 1326 violates the Fifth Amendment), *appeal docketed*, No. 21-10233 (9th Cir. Aug. 20, 2021).

### A. Standard of Review

As a threshold matter, the parties disagree on what standard of review the court should use when analyzing whether Section 1326 violates the Equal Protection Clause. The Government argues that the court should use rational-basis review because Section 1326 is a federal immigration law that warrants a higher level of deference. Nolasco-Ariza argues that the court should apply the *Arlington Heights* factors, which govern equal-protection challenges to facially neutral laws. *See* 429 U.S. at 264–66.

Courts oftentimes use deferential scrutiny when analyzing federal immigration laws because "the responsibility for regulating the relationship between the United States and our [noncitizen] visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). The Government provides the court with several cases noting the importance of this deference in equal-protection cases. *See, e.g. Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (applying rational-basis review to law concerning entry of foreign nationals); *Fiallo v. Bell*, 430 U.S. 787, 792–99 (1977) (applying minimal scrutiny to gender-based distinction giving special immigration preferences to mothers of United States citizens); *Cabral v. Holder*, 632 F.3d 886, 892 (5th Cir. 2011) (applying rational-basis review to statute distinguishing between noncitizens seeking relief from within the country and those who apply after departing). The Government argues that because Section 1326 regulates the admission and exclusion of noncitizens, the court must apply rational-basis review.

4

The court acknowledges the importance of deference to the political branches on matters of immigration. However, this deference is not as broad as the Government argues. The cases that the Government provides all address the political branches' nearly plenary power to *admit* or *exclude* certain people. *See, e.g., Fiallo*, 430 U.S. at 795 n.6 ("We are dealing here with an exercise of the Nation's sovereign power to admit or exclude foreigners in accordance with perceived national interests."). The court recognizes the distinction between those policies directly controlling the admission or exclusion of noncitizens—which are not subject to exacting judicial review—and those policies "that are specifically directed towards [noncitizens] but do not set criteria for admission and exclusion." *See Barcenas-Rumualdo*, No. EP-20-CR-1849-DB, slip op. at 10 (W.D. Tex. May 7, 2021) (order denying motion to dismiss), *appeal docketed*, No. 21-50795 (5th Cir. Aug. 27, 2021) ("While Congress certainly has power over [noncitizens] themselves, the Fifth Circuit suggests that power is not afforded the same high level of deference as Congress's power to set requirements for admission to the United States."); *Rodriguez-Silva v. INS*, 242 F.3d 243, 247 (5th Cir. 2001) ("[T]he broad power to control immigration does not imbue Congress with plenary power over [noncitizens] themselves.").

Section 1326 sets out a criminal offense for those found in the country after previous deportation. The law does not control the admission or exclusion of noncitizens, but instead establishes a punitive policy for those who have already been deported from the country. Because the law does not directly control the admission or exclusion of noncitizens, the court is not required to give broad deference to Section 1326. Like many of the district courts that have confronted similar equal-protection challenges, the court will apply the *Arlington Heights* test when analyzing Section 1326. *See, e.g., United States v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774, at *2 (S.D. Tex. Feb. 2, 2022) (applying *Arlington Heights* framework in Fifth Amendment

5

challenge to Sectsion 1326); *Barcenas-Rumualdo*, No. EP-20-CR-1849-DB, slip op. at 10 ("The Court will reject the Government's argument that it must, out of respect for Congress's power over immigration, limit itself to rational-basis review.").

**B.      Applicable "official action"**

As a second threshold issue, the parties disagree on what version of Section 1326 constitutes the "official action" warranting analysis under the *Arlington Heights* framework. *See* 429 U.S. at 264–65 (analyzing "official action" for "racially disproportionate impact" and "racially discriminatory intent or purpose"). Nolasco-Ariza argues that the 1929 Act is the relevant "official action" because subsequent recodifications and amendments failed to "cleanse the unlawful re-entry statute from its racist origins." The Government argues that "events predating [the 1952 Act] carry little weight in assessing [Section 1326] under *Arlington Heights*."

The court notes—and the parties appear to agree—that the record provides ample evidence showing rampant racism and anti-Mexican sentiment in the passage of the 1929 Act. District courts addressing similar equal-protection challenges to Section 1326 have likewise acknowledged that discrimination motivated the 1929 Act. *See, e.g., Hernandez-Lopez*, 2022 WL 313774 at *2 ("[S]everal district courts have addressed the same motion and arguments [challenging Section 1326 as violating the Equal Protection Clause] . . . . All have acknowledged the racial animus behind the 1929 law"); *Barcenas-Rumualdo*, No. EP-20-CR-1849-DB, slip op. at 26 ("[T]he Court concludes that . . . [the 1929 Act] was passed with discriminatory purpose . . . . the racial animus of the 1920s made its way into Congress—expressing itself as a fear of 'mongrelization' and 'degradation' of the United States—and was a motivating factor in a law aimed specifically at Mexicans."); *Carrillo-Lopez*, 555 F. Supp. 3d at 1009 ("The evidence clearly indicates, as both parties and other district courts agree, that the Act of 1929 was passed during a time when nativism

and eugenics were widely accepted, both in the country at large and by Congress, and that these racist theories ultimately fueled the Act's passage.").

However, as the Government points out, the court's *Arlington Heights* analysis is not bound to the 1929 Act and the history behind it. *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."). By amendment, "a facially neutral provision . . . might overcome its odious origin." *Cotton v. Fordice*, 157 F. 3d 388, 391 (5th Cir. 1998). Subsequent amendments of a law may "remove[] the discriminatory taint associated with the original version" if the legislature conducts a "deliberative process" and the amendments were not "adopted out of desire to discriminate" against the protected class. *Id.* at 391–92. Historical evidence that is not "reasonably contemporaneous" with the challenged action "has little probative value." *Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016) ("*Veasey I*"). "Substantial, race-neutral alterations" may also remove the discriminatory taint from "an old unconstitutional law." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018) ("*Veasey II*").

In determining whether the 1952 Act supersedes the 1929 Act as the "official action" for the *Arlington Heights* analysis, the court begins by analyzing whether the 1952 Act demonstrated a "desire to discriminate" against Mexicans or Latinos. Nolasco-Ariza argues that Congress's continued discrimination in the 1952 Act is apparent through President Truman's veto statement, which described the legislation as "perpetuat[ing] injustices of long standing" and "intensify[ing] the repressive and inhumane aspects of our immigration procedures." The court notes, however, that President Truman's veto statement largely deals with the 1952 Act's quota system and its discrimination against Asian migrants. Nolasco-Ariza also argues that the use of the slur "wetback" in Deputy Attorney General Ford's letter to Congress further exemplifies

7

discrimination against Mexicans at the time of the 1952 Act.[1] Although the court agrees that the use of the slur (which occurs once while quoting a report) indicates continued anti-Mexican sentiment, the use of the word by one member of the executive branch in a letter to Congress does not indicate that Congress "desire[d] to discriminate" against Mexicans or Latinos in passing the 1952 Act.

The court must also determine whether the 1952 Congress undertook a "deliberative process" in recodifying and amending Section 1326 through the 1952 Act. Nolasco-Ariza argues that because Congress did not discuss or debate Section 1326's illegal re-entry provisions prior to passing the 1952 Act, the amendment did not eliminate the 1929 Act's racist underpinnings. The Government argues that Congress made several substantive changes to Section 1326, including adding the "found in" clause, thus indicating some level of deliberation. Neither party argues in any depth about the procedural processes surrounding the 1952 Act's recodification of Section 1326. The court agrees with the Government and several other district courts that the 1952 Act re-enacted Section 1326 through a "deliberative process." *See, e.g., Barcenas-Rumualdo*, No. EP-20-CR-1849-DB, slip op. at 30 ("The Court finds that Section 1326 has been re-enacted through a 'deliberative process' bearing sufficient resemblance to the process described in *Cotton* to dictate the same outcome.").

Next, the court must consider whether the 1952 Act made "substantial, race-neutral alterations" to Section 1326. *See Veasey II*, 888 F.3d at 802 ("Substantial, race-neutral alterations" may remove discriminatory taint from "an old constitutional law."). Nolasco-Ariza argues that the 1952 Act constituted a "word-for-word" recodification of the 1929 Act that did not make

---

[1] Professor O'Brien describes "wetback" as a "racially derogatory" term that, when used in the 1940s and 1950s, was "synonymous with Mexicans."

substantial, race-neutral alterations. The Government responds that the 1952 Act includes several race-neutral substantive changes, including: (1) the "found in" phrasing that expanded the Government's enforcement ability; (2) changing the reentry prohibition's reach from those "arrested and deported" to those "excluded and deported;" (3) omitting the phrase "in pursuance of law" that the Supreme Court later held may have allowed challenges of earlier deportation orders as a defense to Section 1326 prosecutions; and (4) adding language "except[ing] those [noncitizens] who have either received the express consent of the Attorney General to reapply for admission or who otherwise establish that they were not required to obtain such consent." The court agrees with the Government that these changes constitute "substantial, race-neutral alternations" to the original version of Section 1326.

Lastly, the court must consider the timing between the passage of the original act and the subsequent amendments. *See Veasey I*, 830 F.3d at 232 (noting that evidence not "reasonably contemporaneous" with modern version of law "has little probative value"). As the Government points out, 23 years passed between the 1929 Act and the 1952 Act. This temporal remoteness makes it less reasonable to impute the motives underlying the 1929 Act to the 1952 Congress. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct 1891, 1916 (2020) (plurality) (listing temporal remoteness as reason to give statements less credence when determining discriminatory intent). The Government also argues that a 96% legislator turnover took place between the two Congresses at issue, which further underscores the temporal remoteness between the 1929 Act and the 1952 Act. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 n.22 (2021) ("procedural irregularities... had less probative value for inferring the purpose behind [acts of Congress] because the bills were passed 'during different legislative sessions by a substantially different composition of legislators.'").

9

In response to the Government's arguments on the issue of timing, Nolasco-Ariza relies heavily on *Abbott v. Perez*, in which the Supreme Court stated that the intent of the originally enacting legislature is relevant "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent [of the subsequent legislature.]" 138 S. Ct. 2305, 2327 (2018). Importantly, the Court in *Perez* discussed redistricting maps passed by state legislatures only two years apart. *See id.* Conversely, because the re-enacting legislature met decades later with a substantially different slate of legislators to pass the 1952 Act, the impact of the racist intent attributable to the earlier Congress is more limited.

Additionally, Nolasco-Ariza directs the court to *Hunter v. Underwood*, where the Supreme Court struck down an Alabama felon-disenfranchisement law originally motivated by racial animus as unconstitutional despite a series of judicial decisions that had previously struck down its most discriminatory sections. 471 U.S. at 232–33 ("Without deciding whether [the statute] would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect."). Several courts have noted, however, that *Hunter* dealt with a law amended by judicial decisions, not a law amended by legislative revisions. *See Perez*, 138 S. Ct. at 2325 (noting that *Hunter* was not "a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature"); *Cotton*, 157 F.3d at 391 ("*Hunter*, however, left open the possibility that by amendment, a facially neutral provision [] might overcome its odious origin."). Because Section 1326 was recodified and amended through a decades-later legislative process instead of a judicial process, the reasoning in *Perez* and *Hunter* cannot apply.

The court concludes that the 1952 Act constitutes the appropriate "official action" for review under the *Arlington Heights* analysis. The 1929 Act and its historical and legislative background retains some relevance given the factors that *Arlington Heights* requires the court to consider, but the court is not bound by the 1929 Act in evaluating the constitutionality of Section 1326 as it exists today.

### C. *Arlington Heights* Analysis

Finally, the court must apply the *Arlington Heights* framework in determining whether Section 1326 violates the Fifth Amendment. The "starting point" of an *Arlington Heights* inquiry "is whether the challenged action 'bears more heavily on one race than another.'" *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Tex.*, 6 F.4th 633, 639 (5th Cir. 2021) (quoting *Arlington Heights*, 429 U.S. at 266). If this disparate racial impact is clearly unexplainable on grounds other than race, then the court may infer racial animus. *Id.* If not, the court must perform "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* The Supreme Court has provided five factors to guide this "sensitive inquiry": "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Id.* (quoting *Veasey I*, 830 F.3d at 231). These factors are not exhaustive, and the ultimate determination requires examining "the totality of the circumstances." *Id.* Because government bodies are rarely "motivated by a single concern," Nolasco-Ariza need not prove that Section 1326 was passed solely due to racial discrimination, but merely that it was one motivating factor. *See Arlington Heights*, 429 U.S. at 265.

To meet the initial burden under *Arlington Heights,* Nolasco-Ariza must first show that the challenged action "bears more heavily on one race than another"—in other words, that the law has

11

a disparate impact. *See* 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). The Government does not dispute that a significant portion of defendants charged with violating Section 1326 are Latinos or that the statute has a disparate impact on Latinos as a distinct racial group. Nolasco-Ariza directs the court to a report from the United States Sentencing Commission that indicates that in 2020, 99% of those convicted of illegal re-entry were Hispanic. Nolasco-Ariza also directs the court to a report from the U.S. Department of Justice indicating that in 2010, 98% of those charged with illegal re-entry were from Latin America. The court finds that Nolasco-Ariza has met the "starting point" element of the *Arlington Heights* framework by demonstrating that Section 1326 has a disparate impact on Latinos.

Next, Nolasco-Ariza must demonstrate that Congress acted with discriminatory purpose when passing the 1952 Act. The court will address each of the five *Arlington Heights* factors in turn.

### 1. *Historical Background of the Decision*

*Arlington Heights* identifies the historical background of the decision as one "evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267. In the motion to dismiss and the supporting record, Nolasco-Ariza paints a troubling and compelling picture of the racial animus that infected the 1929 Act and continued to thrive in the United States well into the twentieth century. The era in which Congress first established Section 1326 included overt racism and discrimination against Latinos in nearly all aspects of American society. *See, e.g., Westminster Sch. Dist. of Orange Cty. v. Mendez*, 161 F. 2d 774, 781 (9th Cir. 1947) (holding that segregation of Mexican-American school children violated Fourteenth Amendment); *Loving v. Virginia*, 388 U.S. 1, 7 (1967) (describing how courts historically upheld racist anti-miscegenation laws). Nolasco-Ariza also draws the court's attention to the repatriation drives of the Great Depression, which, he argues, amounted to a "government-led campaign of

12

intimidation and coercion" against Latinos in the United States. Nolasco-Ariza also points to the Bracero program of the mid-century, which Professor Kang describes as reinforcing "longstanding racist notions that Mexican migrants deserved admission into the United States not as prospective citizens but instead as a cheap, exploitable, and deportable labor force." Finally, Nolasco-Ariza argues that the same Congress that passed the 1952 Act also passed Senate Bill 1851, known as the "Wetback Bill," demonstrating open racial animus against Mexicans.

In its response, the Government concedes that the racism that existed during the 1930s, 40s, and 50s is "undeniable." However, the Government argues that Nolasco-Ariza's arguments are "recycled" from the analysis in *United States v. Carrillo-Lopez*, the first case in which a federal district court granted a motion to dismiss on the grounds that Section 1326 violates the Fifth Amendment. *See* 2021 WL 3667330 at *1. The Government notes that a wide variety of other federal district courts have upheld the law against attacks on similar grounds. *See, e.g., Hernandez-Lopez*, 2022 WL 313774 at *6; *United States v. Sanchez-Felix*, No. 21-CR-310, 2021 WL 6125407, at *7 (D. Colo. Dec. 28, 2021); *United States v. Suquilanda*, No. 21-CR-263, 2021 WL 4895956, at *5 (S.D.N.Y. Oct. 20, 2021); *Barcenas-Rumualdo*, No. EP-20-CR-1849-DB, slip op. at 33. The Government argues that without more specific evidence, the court should not impute the historical racism in the period leading up to the 1952 Act to the Congress that passed the act.

The record before the court describes specific instances of overt racism against Latinos in the years preceding the 1952 Act. *See also Hernandez-Lopez*, 2022 WL 313774 at *2 (describing history behind Section 1326 as "shameful"). The court finds that the first *Arlington Heights* factor—the historical background of the decision—weighs in favor of a finding of discriminatory purpose. *See* 429 U.S. at 267.

13

### 2.   *Specific Sequence of Events Leading to the Decision*

The second factor that *Arlington Heights* instructs the court to consider is the "specific sequence of events leading up to the challenged decision." *Id.* Nolasco-Ariza presents evidence that Congress passed Senate Bill 1851—colloquially known as the "Wetback Bill"—just months prior to passing the 1952 Act. The Government responds that Senate Bill 1851 was an anti-harboring measure, distinct from Section 1326 and passed for a legitimate government purpose of combatting harboring and fixing a previous version of the law that the Supreme Court had ruled unconstitutional. The Government also argues that although the term "wetback" is clearly a racial epithet today, the linguistic norms of the 1950s differed significantly, and courts and presidents alike used the term in non-racist manners.

Similarly, Nolasco-Ariza directs the court to Deputy Attorney General Ford's letter to Congress, which uses the term "wetback." Nolasco-Ariza argues that this letter demonstrates racist intent and argues that it spurred Congress to include the "found in" language that expanded the Government's enforcement ability for Section 1326. The Government responds that the letter merely indicates Ford's support of the "found in" provision that Congress had already included in the draft bill, which was sent to the Justice Department for review. The Government also argues that because Ford was not a member of Congress, the court should not impute Ford's use of the term and position on the issue to Congress. *See Hernandez-Lopez*, 2022 WL 313774 at *5 ("Ford was not a member of Congress, so his use of the racial epithet does not provide evidence of Congress's intent in re-enacting [Section] 1326.").

The court finds that the evidence in the record relating to the specific sequence of events leading up to passage of the 1952 Act does not weigh towards a finding of discriminatory intent. As noted in Professor Kang's affidavit, "Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952

Act." *See also Barcenas-Rumualdo*, No. EP-20-CR-1849-DB, slip op. at 32 ("[T]he evidence . . . of discriminatory animus behind the re-enactments of [Section] 1326 lacks the specificity of the evidence . . . about the 1929 criminal re-entry law."). The court finds that the second *Arlington Heights* factor weighs against a finding of discriminatory purpose.

### 3. *Departures from the normal procedural sequence*

Next, *Arlington Heights* counsels the court to consider departures from the normal procedural sequence. 429 U.S. at 564–65. Nolasco-Ariza's arguments on this factor focus on perceived logical fallacies in the "Wetback Bill" passed several months before the 1952 Act. Nolasco-Ariza argues that Congress did not design the statute to address the stated aim of curbing illegal immigration, but instead structured the law to shelter employers from prosecution for "harboring" migrant workers. The law at issue in this case, however, does not address employer liability or any "harboring" provision. Therefore, even if the court could infer discriminatory intent from this alleged inconsistency, it cannot impute that same intent to the 1952 Act.

Nolasco-Ariza also argues that Congress's lack of debate on the illegal re-entry provisions of the 1952 Act constitutes a departure from the normal sequence. The Government responds that the lack of debate indicates that Section 1326 was "uncontroversial and widely supported," and the Congressional debates instead focused largely on the 1952 Act's quota system. The court does not find that the lack of debate over Section 1326 constitutes a departure from procedural norms. *See Kimbrough v. United States*, 552 U.S. 85, 87 (2007) (warning against "[d]rawing meaning from [Congressional] silence").

Finally, Nolasco-Ariza notes that Congress relied on Deputy Attorney General Ford's letter to expand the reach of the illegal re-entry provision with the "found in" language and argues that this reliance was "procedurally irregular and shows racial animus." The Government responds that Ford did not propose the "found in" language, but instead provided the letter in response to a

15

request for the Justice Department's comments on the draft bill. Nolasco-Ariza provides no authority indicating why receiving input from the Justice Department constitutes a procedural irregularity. The court finds that the letter from Ford does not constitute a departure from procedural norms and concludes that the third *Arlington Heights* factor weighs against a finding of discriminatory purpose.

### 4. *Substantive departures*

The next *Arlington Heights* factor instructs the court to consider substantive departures from the normal sequence. 429 U.S. at 267. Specifically, the court must determine whether "the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.*

Nolsaco-Ariza does not direct the court to any substantive departure from the normal sequence in passing the 1952 Act. Other courts have determined that "there is nothing 'substantively irregular about [the 1952 Act] or [Section 1326].'" *See, e.g., Sanchez-Felix*, 2021 WL 6125407 at *8. The court finds that the fourth *Arlington Heights* factor weighs against a finding of discriminatory purpose.

### 5. *Legislative history*

Finally, *Arlington Heights* instructs the court to consider legislative history, "especially where there are contemporary statements by members of the decisionmaking body." 429 U.S. at 268. On this factor, Nolasco-Ariza directs the court to President Truman's veto of the 1952 Act, which accused the legislation of perpetuating long-standing injustice and discrimination. Congress overrode that veto without grappling with the president's admonishment of the legislation. The Government cautions against the court's consideration of these events for two reasons: First, the Government argues that statements by a bill's opponent should be taken with caution. *See Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 29 (1988). Second, the Government argues that

16

the 1952 Act was a broad piece of legislation, and the president's statements largely refer to the quota systems that the 1952 Act left in place. As a whole, the legislative history of the 1952 Act was largely free of racist expressions. *See Hernandez-Lopez*, 2022 WL 313774 at *4 ("Professors Hernandez and Gonzalez-O'Brien both testified that the legislative history of the [1952 Act] was largely free of explicitly racist expressions.").

With regard to the subsequent amendments, Nolasco-Ariza presents legislative history surrounding the enactment of each amendment and, more generally, the surrounding immigration reform. Any evidence specific to the post-1952 amendments to Section 1326 fails to establish discriminatory intent. The court finds that the evidence in the record relating to the legislative history of Section 1326 and its subsequent amendments does not weigh towards a finding of discriminatory intent.

Having conducted the five-factor "sensitive inquiry" under the *Arlington Heights* framework, the court concludes that the 1952 Act was not passed with discriminatory intent. *See* 429 U.S. at 266. While the first factor—the historical background of the decision—weighs in favor of a finding of discriminatory intent, the remaining factors weigh against such a finding. After reviewing the evidence and considering the totality of the circumstances, the court concludes that Nolasco-Ariza has not shown that Section 1326 was passed with discriminatory intent.

D.   **Rational-basis review**

Because Nolasco-Ariza has not shown that Section 1326 was enacted with discriminatory motive, the court will review the statute to determine if it is "rationally related to legitimate government purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *See also United States v. Ramos*, 858 F. App'x 759, 761 (5th Cir. 2021). Rational-basis review provides the government policy or action a "strong presumption of constitutional validity." *Flores-Ledezma v. Gonzales*, 415 F.3d 375, 381 (5th. Cir. 2006) (citing *Heller v. Doe*, 509 U.S.

312, 319 (1993)). The burden of proof is on the party challenging the law, who must negate "every conceivable basis which might support it." *Heller*, 509 U.S. at 320 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The conceivable bases on which the law could be supported need not have a foundation in the record. *Id.* at 320–21. Finally, the court must accept even imperfectly fitting generalizations. *Id.* at 321 (citing *Dandridge v. Williams*, 397 U.S. 471, 485 (1970).

Courts have found that deterring illegal re-entry is a legitimate governmental purpose. *See, e.g.*, *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007) ("The enhancement serves the legitimate government interest of deterring illegal re-entry by those who have committed drug-related and violent crimes"); *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("[Section 1326's] clear purpose . . . is to deter [noncitizens] who have been forced to leave the United States from re-entering the United States"). Section 1326—which creates criminal penalties for noncitizens who re-enter the country after prior deportation—is rationally related to the legitimate governmental purpose of deterring illegal re-entry and enforcing immigration laws. Although the history behind Section 1326 is shameful, the court concludes that Section 1326 does not violate the Fifth Amendment.

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Ambrosio Nolasco-Ariza's Motion to Dismiss Because § 1326 Violates the Fifth Amendment (Doc. #20) is **DENIED**.

SIGNED this 10th day of June, 2022.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE